```
UNITED STATES DISTRICT COURT            FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
FRANK WARREN, et al.,                   :
                                        :
                       Plaintiffs,      :    MEMORANDUM
                                        :    AND ORDER
       - against -                      :
                                        :    01-CV-2909 (JG)
XEROX CORPORATION,                      :
                                        :
                       Defendant.       :
----------------------------------------------------------------- X
```

A P P E A R A N C E S :

    MILBERG LLP
        One Pennsylvania Plaza
        New York, New York 10119
    By:    Barry Weprin
           Neil Fraser

        - and -

    DIANE BRADLEY & ASSOCIATES, PLLC
        1629 K Street, N.W.
        Washington, DC 20006
    By:    Diane Bradley

    Attorneys for Plaintiffs

    NIXON PEABODY, LLP
        437 Madison Avenue
        New York, NY 10022-7001
    By:    Christopher A. D'Angelo
           Eugene D. Ulterino
           Amy Laura Ventry

    Attorneys for Defendant

JOHN GLEESON, United States District Judge:

        The named plaintiffs filed the complaint in this litigation on May 9, 2001.  It alleged that the defendant Xerox Corporation ("Xerox") engaged in a pattern and practice of unlawful discrimination against plaintiff class members on account of their race and otherwise

intentionally violated their civil rights by (i) systematically assigning Black sales people to inferior sales territories, often located in low-income or minority neighborhoods; (ii) refusing to promote them or transfer them to more lucrative territories no matter how hard they worked or how well they performed; (iii) denying them sales commissions they rightfully earned; and (iv) retaliating against Black salespeople who assert their civil rights.  The class complaint sought damages, including back pay and front pay, attorneys' fees, and other equitable relief.

On May 30, 2003, plaintiffs filed a motion for class certification, which was referred to Magistrate Judge Roanne L. Mann.  On January 30, 2004, Judge Mann issued a Report and Recommendation, which recommended that a class be certified comprising all Black sales people who have been, continue to be, or may in the future be affected by defendant's alleged pattern and practice of racial discrimination in assignments of sales territories, promotions and compensation.  Judge Mann recommended that I deny plaintiffs' request to certify subclasses based upon claims of retaliation or state law violations.  On March 11, 2004, I adopted Magistrate Judge Mann's Report and Recommendation in full.

Discovery in the case included more than 50 days of deposition testimony and the disclosure of thousands of pages of documents.  Plaintiffs' counsel engaged experts who produced various statistical reports in support of plaintiffs' claims.

A proposed settlement was submitted to this Court for preliminary approval on March 7, 2007.  On April 16, 2007, I directed the parties to answer questions related to, among other things, proposed payments to the class representatives and other class members.  After hearing argument on June 6, 2007, I denied preliminary approval of the proposed settlement.

In a different proposed settlement before me now, Xerox has agreed to settle the case for $12,000,000, inclusive of attorneys' fees, and it has also agreed to the imposition of

injunctive relief. The terms are set forth in a Proposed Consent Decree, which is referred to here as the "Settlement Agreement." The agreement permits incentive awards for the named plaintiffs subject to my approval, but caps the awards at $50,000 per named plaintiff. Class counsel requests $4 million in fees, costs and litigation-related expenses. Attorneys' fees and costs are to be paid out of, not in addition to, the $12,000,000 Settlement Fund. *See* Settlement Agreement, Article XVII, Section T.1.

Of the "Remainder Settlement Fund" (the $12,000,000 less the amounts paid to the class representatives and attorneys' fees), 48.5% will be allocated to the Back Pay Funds, and 51.4 % will be allocated to the Compensatory Damages Fund. *See* Settlement Agreement, Article XVII, Section L. Distribution of the Back Pay Funds will be determined by a formula that calculates the award based on the time a class member was employed at Xerox. Class members' awards range from a low of $2,000 to a high of $4,000. *See* Affidavit of Neil Fraser dated July 3, 2008 ("Fraser Aff.") ¶ 20. The funds allocated to the Compensatory Damages Fund will be distributed according to a formula that takes into account the length of time that the employee experienced emotional distress or was retaliated against while employed by Xerox. *See* Settlement Agreement, Article XVII, Section N.10. At oral argument, counsel for the class estimated that if there are 50 claims for compensatory damages,[1] the awards will range widely, from $20,000 to $150,000, with the average being $75,000. *See* July 11, 2008 Tr. at 17-19. Though my efforts to determine with precision how the named plaintiffs will fare under the formula have not been successful, it appears they will be in the high end of that range; counsel

---

[1] A letter dated August 26, 2008 from class counsel reports that 58 compensatory damage claims have been filed.

3

predicted that each will receive between $100,000 and $150,000, plus any incentive award I approve.  *Id.* at 22.[2]

The Settlement Agreement also provides for equitable relief:  Xerox will commission a task force, comprised of a diverse group of Xerox personnel, that will evaluate disparities, if any, with respect to compensation for African-American commissioned sales representatives.  The Task Force will evaluate and ensure that territory configurations, assignments, quotas and budgets are assigned in a non-discriminatory manner among similarly-situated commissioned sales representatives.  Based on the Task Force's analysis, a list of draft recommendations will be prepared, subject to comment by the plaintiffs.   A timetable for the implementation of the recommendations will also be provided.  *See* Settlement Agreement § XVI; *see also* Affidavit of Neil Fraser dated July 3, 2008 ¶ 23-28.

I granted Preliminary Approval of the Settlement Agreement on April 3, 2008.  Thereafter, each class member received notice summarizing the overall settlement, informing the

---

[2]   My efforts in connection with the first proposed settlement produced the response set forth on pages 13 -14 of docket entry 82.  At the fairness hearing, in connection with the Settlement Agreement, counsel responded as follows:

> THE COURT:    Can you tell me the difference between the amount of money your named plaintiffs would get if you got what you are asking for as opposed to them being just absent class members?  I'm trying to get a fix […]
> MR. WEPRIN:    I think the amount that -- I think if they were absent class members they would get --
> THE COURT:    Well, $50,000, less?
> MR. WEPRIN:    Yes.
> THE COURT:    But what are the numbers for each one?
> MR. WEPRIN:    Well, I think, you know, we did -- I think they would -- well, again, depending on if in fact the full claim amount was -- if the full claim amount -- if the full -- in other words, if the claims allow the full amount of points systems to be done, which worked at the number of people that we did, they would each get between 100 and $150,000 as absent class members plus their 50,000 as incentive awards
> THE COURT:    That's assuming the 44 claims.
> MR. WEPRIN:    Yes, I think it's 50.
> MR. BRADLEY:  Right, thereabouts.

Transcript of July 11, 2008 Oral Argument, 20-21.

class member of his or her award, and stating the maximum incentive awards that the named plaintiffs were eligible to receive. Almost 1500 notices were sent. Only one class member objected to the proposed settlement; only three opted out. On July 11, 2008, I held a fairness hearing, at which no objectors appeared.

## DISCUSSION

A.   *The Settlement Class*

The use of a settlement class allows the parties to concede, for purposes of settlement negotiations, the propriety of a class action. It also allows the court to postpone formal certification of the class until after settlement negotiations have ended. The Supreme Court has expressly approved the use of this device. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 619 (1997) ("the 'settlement only' class has become a stock device").

Settlement classes can be certified only if all of the requirements for class certification under Rule 23 are met. *See id.* When considering the propriety of a settlement class, the fact of settlement is "relevant to class certification" and compels "heightened" attention to the requirements "designed to protect absentees by blocking unwarranted or overbroad class definitions." *Id.* Rule 23(a) specifies the following requirements for bringing a class action:

> (1) the class [must be] so numerous that joinder of all members is impractical, (2) there [must be] questions of law or fact common to the class, (3) the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class, and (4) the representative parties must fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition, where, as here, the plaintiffs allege that the class action is maintainable under Rule 23(b)(2) (*see* Settlement Agreement § VII), they must show that "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief

sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 164. Plaintiffs have satisfied these requirements, for the plaintiffs seek to end past and on-going disparate treatment of Blacks and African-Americans at Xerox, and seek to remedy how the sales teams are formulated and how the teams are assigned to customers and sales territories.

Class members were provided notice and given the right to opt out of the damages aspects of the settlement pursuant to this Court's order dated April 3, 2008, preliminarily approving the Settlement Agreement and preliminarily certifying the class. This is sufficient to ensure that the class members' due process rights with respect to the damages claim have not been jeopardized. *See, e.g., Robinson*, 267 F.3d at 166-67. Accordingly, class certification pursuant to Rule 23(b)(2) is approved.

Plaintiffs also allege that the action is maintainable under Rule 23(b)(3) (*see* Settlement Agreement § VII). They have shown that common questions "predominate over any questions affecting only individual members," and that a class action is "superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

The settlement class in this case is defined as follows: "all African American or Black persons, including the Class Representative Plaintiffs, who are, or have been employed by Xerox in a sales representative position with USCO, XBS or NASG at any time from February 1, 1997 through [April 3, 2008] and who holds or held a quota-bearing sales territory assignment and is or was a part of the commission sales workforce." Settlement Agreement § VII. I am satisfied that (i) this settlement class meets the four threshold requirements of Rule 23(a); (ii) questions of law or fact common to the members of the class predominate over any questions

6

affecting only individual members; and (iii) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Therefore, I find that final certification of the settlement class is proper.

B.    *The Standard for Approving a Proposed Settlement*

Pursuant to Rule 23(e), any settlement or dismissal of a class action requires court approval. In order to approve such a settlement, the court must determine that the settlement is "fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000). In so doing, the court must "eschew any rubber stamp approval" yet simultaneously "stop short of the detailed and thorough investigation that it would take it if were actually trying the case." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974); *abrogated on other grounds by Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir. 2000). Judicial discretion should be exercised in light of the general policy favoring settlement. *See Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir. 1982).

Fairness is evaluated by examining (1) the negotiations that led up to the settlement, and (2) the substantive terms of the settlement. *See In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d 139, 145 (E.D.N.Y. 2000). "The [negotiation] process must be examined 'in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves.'" *Id.* at 145-46 (quoting *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983)). Factors relevant to the substantive fairness of a proposed settlement include: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the

defendant to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *See Grinnell*, 495 F.2d at 463.

1. *Procedural Fairness*

I find that the Settlement Agreement is procedurally fair because (i) it was the product of arms-length negotiations, and (ii) class counsel are skilled and fully informed by sufficient discovery. The process by which the parties negotiated the Settlement Agreement demonstrates its fairness to class members. The record in the case reveals that the case has been aggressively and thoroughly litigated over the seven years it has been pending. The mediation process began with preparation by both sides of detailed confidential mediation statements setting forth their claims and defenses, as well as the evidence developed in discovery to support their respective positions. A mediator, selected for his broad experience in employment discrimination class action settlements, assisted in these discussions. Face-to-face meetings among counsel with the mediator began in March 2006, but the sessions threatened to break down on several occasions due to the difficult issues and vigorous lawyering on behalf of both parties. Extensive negotiations were conducted on all issues, including the provisions for back pay and compensatory damages. After many months of mediation and occasional breakdowns in discussions, the parties reached an agreement in principle on May 31, 2005. Breakdowns in settlement negotiations are evidence that the parties' settlement was at arm's length and non-collusive in nature. *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 336-37 (S.D.N.Y. 2005).

The extensive discovery in the case adequately informed the parties of the merits of their cases. Discovery involved a voluminous document exchange, more than 50 days of

depositions, the retention of expert witnesses, and the litigation of numerous discovery disputes. *See* Affidavit of Neil Fraser dated July 3, 2008 ("Fraser Aff.") ¶ 13. Considering the good-faith negotiation process and the sufficiency of discovery, I conclude that the Settlement Agreement is "fair, adequate, and reasonable, and not a product of collusion." *Joel A. Giuliani*, 218 F.3d at 138.

    2.    *Substantive Fairness*

        a.    *The complexity, expense and likely duration of the litigation*

Because this case involves complex factual and legal issues, a trial on the merits would consume considerable time and resources. Dueling experts and sophisticated statistical models would no doubt add to the complexity of the proof. A jury's verdict would likely be appealed, thereby extending the duration of the litigation.

        b.    *The reaction of the class to the settlement*

Out of a class of approximately 1,496 people, only three (constituting approximately 0.2% of the class) opted out of the Settlement Agreement, and only one class member objected to the Settlement Agreement.

The objector, Laurence R. Crockett, challenges the distribution formula for both back pay and compensatory damages. He states that the distribution plan for the Back Pay Funds did not take into consideration the "severely damaged class member vs. damaged class member vs. minor damaged class member." Objection 1 to Proposed Settlement by Laurence Crockett at 1. He argues that the plan treats severely damaged class members "financially the same as the few Black Reps who remained or obtained a lucrative territory after the reorganization. This is fundamentally unfair." Crockett recommends the following additions to the distribution plan: "(1) 2 additional points for every year your assignment was configured to have more than 50%

9

Public Sector accounts during the Class Period; (2) 3 additional points, if both your total compensation was reduced any calendar year more than $15,000 between 1/1/1997 and 1/1/2002, and your territory assignment was changed by more than 30% from 1/1/1997 and 1/1/2002; (3) 2 additional points, if 1 & 2 were true for your assignment during the class period." *Id.* Crockett's proposed formula, however, would exclude members of the class who were employed after January 1, 2002. It would also be difficult to implement. I find that the objection does not warrant an amendment to, or a disapproval of, the Settlement Agreement.

Crockett also objected to the fairness of the distribution plan for compensatory damages. He inaccurately asserts that a medical leave and the filing of an EEOC complaint are prerequisites to eligibility for compensatory damages. Objection 2 to Proposed Settlement Agreement by Laurence Crockett at 1, 2. In fact, any written complaint to Xerox asserting race discrimination or retaliation would qualify a class member for consideration for compensatory damages. Crockett also seeks to broaden the scope of recovery for emotional distress claims, challenging the Settlement Agreement's requirement that medical conditions must be related to discrimination experienced at Xerox to be compensable. I do not find this challenge persuasive, as the proposed alternative could potentially open up the action to claims that are unrelated to the alleged discrimination that lay at the heart of the cases.

In sum, this *Grinnell* factor strongly indicates that the settlement is fair and advantageous to the class.

   c. *The stage of the proceedings and the amount of discovery completed*

Since the initiation of this litigation seven years ago, the parties have engaged in mediation, extensive discovery, motion practice, and protracted settlement negotiations. Thus,

10

by the time the Settlement Agreement was achieved, both sides were in a position to make informed judgments about the merits of the case and the Settlement Agreement.

    d. *The risks of establishing liability and damages, and of maintaining the class action through the trial*

A trial in this case would involve significant risks to the plaintiffs, including the risks that they might fail to prove a pattern or practice of discrimination based on statistical and anecdotal evidence; fail to overcome various defenses; and fail to prove damages. Defendant would likely file motions seeking to reduce or decertify the class, and while plaintiffs believe that they would prevail on such motions, there is nevertheless a risk that they would not.

    e. *The ability of the defendant to withstand a greater judgment*

Defendant is a large, multi-national corporation, and the collectability of a judgment is not a factor here.

    f. *The range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation*

The $12 million settlement amount and the equitable relief are within the range of reasonableness. The Settlement Agreement provides for substantial payments to the class members now, rather than leaving them with the prospect of uncertain relief later. Additionally, the equitable relief has not been factored in to the overall value of the settlement, but it adds significant value. I find that the reasonableness of the settlement in light of the best possible recovery and all attendant litigation risks weighs in favor of approving the Settlement Agreement.

    In sum, I conclude that the Settlement Agreement is both procedurally and substantively fair.

3.  *Monetary Recovery by the Named Plaintiffs*

Though I have acknowledged the appropriateness of incentive award payments to class representatives in employment discrimination cases, *see generally Sheppard v. Consol. Edison Co.* (*Sheppard I*), No. 94-cv-403 (JG), 2000 WL 33313540 (E.D.N.Y. Dec. 21, 2000) *and Sheppard v. Consol. Edison Co.* (*Sheppard II*), No. 94-cv-403 (JG), 2002 WL 2003206 (E.D.N.Y. Aug. 1, 2002), I am acutely aware of the fact that such payments are in tension with such plaintiffs' fiduciary duty to the absent class members they have voluntary chosen to represent.  The time away from work to respond to discovery requests and to be deposed, for example, are the normal obligations of class representation, which named plaintiffs assume with no reasonable expectation of compensation.  *See Sheppard I* at *5.[3]  Similarly, it is not appropriate to use class settlement funds to compensate named plaintiffs for past or future retaliation against them for having brought the suit, even if such retaliation is difficult to prove.  *Id.*  Finally, the size of any incentive award must be carefully monitored to ensure that named plaintiffs have not accepted a suboptimal settlement of absent class members' claims in exchange for their own special payment.

---

[3] Though, as I observed in *Sheppard II*, at *5, courts in this circuit have approved incentive awards based on a named plaintiff's investment of time and effort, I reiterate here my agreement with Judge Eugene H. Nickerson's statement in *Weseley v. Spear, Leeds & Kellogg*, 711 F.Supp. 713, 720 (E.D.N.Y. 1989) ("Although it is laudable that plaintiff undertook to prosecute this litigation, the court perceives no circumstances warranting a special award.  A class representative is a fiduciary to the class.  If class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.").  Though out-of-pocket costs to named plaintiffs are different, and in my view plainly reimbursable, *see Sheppard II* at *6, n.9, authorizing awards to named plaintiffs in a class action for their time and effort is an invitation to the type of collusion that can seriously prejudice absent class members.  *See also Gulino*, No. 06-cv-2810 (JG) (AKT), 2007 WL 3036890, at *3 (E.D.N.Y. Oct. 17, 2007) ("However, although payments can be made to compensate named plaintiffs for hardships caused by the action, class representatives are fiduciaries of the absent class members, and are expected to endure the ordinary inconveniences of litigation without special compensation.").

For this reason, I decline to award the testifying parties the requested $5,000 each for lost wages incurred as a result of direct representation of the class.  However, consistent with my decision to reimburse the named plaintiffs for out-of-pocket expenses, the testifying parties will be refunded for such expenses in the amount of $45.85 for Diane Wilson, $195.50 for Sandra Nelms, and $81.71 for Eric Smith.

Applying these principles, and taking into account both the amounts the named plaintiffs will recover in damages and class counsel's stated justifications for the incentive awards, I approve such awards to the named plaintiffs in the amount of $5,000 each.

C.  *Attorneys' Fees*

The Settlement Agreement requests $4,000,000 in attorneys' fees and costs. *See* Settlement Agreement § XVII, Section T.1. In awarding attorneys' fees, the Second Circuit has held that both the "lodestar" method of computation (*i.e.,* hours reasonably expended multiplied by a reasonable hourly rate, plus an enhancement if deemed appropriate) and the "percentage of the fund" method are available to district judges in calculating attorneys' fees in common fund cases. *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000). As one court has noted, "[t]he trend, however, in the Second Circuit appears to be the utilization of the percentage method." *Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*, 96 Civ. 0583, 2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002) (citing *In re American Bank Note,* 127 F. Supp. 2d 418, 431 (S.D.N.Y. 2001) ("Although the law in the Circuit has not been uniform, the trend of the district courts in this Circuit is to use the percentage of the fund approach to calculate attorneys' fees.").

Traditional criteria in determining a reasonable common fund fee include: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *See Goldberger*, 209 F.3d at 50. The Second Circuit recommends analyzing the documentation of the hours submitted by counsel as a "cross check" on the reasonableness of the requested percentage. *See id.*

Class counsels' request for $3,080,000 in fees and $914,827 in expenses (totaling approximately $4,000,000), constitutes approximately 33.33% of the total settlement, and is

13

comparable to sums allowed in similar cases.  *See, e.g., Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (finding 33% attorneys' fees to be reasonable, and collecting cases finding the same).  I also find the fairness and reasonableness of the fee award to be supported by the complexities of the case, the difficulty in proving promotional discrimination on a class-wide basis, the time devoted to the litigation, and the substantial class recovery.  I therefore approve the requested fees and costs.

## CONCLUSION

For the reasons stated above, the settlement class is certified, the Settlement Agreement is approved, and all claims against Xerox are dismissed with prejudice as against those members of the settlement class who have not timely exercised their right to be excluded from the Settlement Agreement.

So ordered.

John Gleeson, U.S.D.J.

Dated:   September 19, 2008
            Brooklyn, New York